**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | **Civil Action No. CCB-19-2465** |
| | * | |
| | * | |
| **BALTIMORE COUNTY, MARYLAND** | * | |
| | ****** | |

## MEMORANDUM

This case involves an alleged pattern or practice of discrimination in hiring entry-level police officers and cadets for the Baltimore County Police Department ("BCPD"). Following a multi-year investigation and extended negotiations, the plaintiff United States of America and the defendant Baltimore County, Maryland, jointly move for the entry of an Amended Settlement Agreement ("Agreement") as final. A fairness hearing on the terms of the Agreement was held on April 6, 2021. For the reasons explained below, the court concludes that that terms of the Agreement are fair, adequate, reasonable, lawful, and not a product of collusion or against the public interest. All objections to the Agreement will be overruled, and the joint motion to enter the Agreement as final will be granted.

## BACKGROUND

The United States filed a complaint against Baltimore County on August 27, 2019, pursuant to Section 707 of Title VII, 42 U.S.C. § 2000e-6(a), (ECF 1, Compl.). The United States alleged that, since January 1, 2013, the County used written examinations for selecting entry-level police officers and cadets that had a disparate impact on African American applicants and were not job-related and consistent with business necessity. (*Id.* ¶¶ 14–25). The County denies liability. (ECF 13, Answer). The parties engaged in settlement discussions beginning in the second half of 2019,

1

and participated in several mediation sessions facilitated by Magistrate Judge Susan K. Gauvey. On November 4, 2020, the parties submitted to the court a proposed settlement agreement. (ECF 37-1, Memo. ISO Joint Mot. to Provisionally Enter Settlement Agreement). On November 18, 2020, the court granted the parties' motion to provisionally enter the Agreement and scheduled a fairness hearing for April 6, 2021. (ECF 38). On March 29, 2021, the parties submitted an amended Agreement (ECF 42-3) and a joint motion to enter the Agreement as final (ECF 42).[1] For purposes of resolving this matter, the parties stipulate to the following.

Since at least 2009, the County has used a multiple-choice written exam to begin its selection process for entry-level police officers and cadets at the BCPD.[2] (42-3, Agreement § I.A). From 2009 through April 2019, four versions of this exam (the "challenged exams") were used to screen applicants based on whether they achieved a predetermined score on the exam. (*Id.* §§ I.B. ¶¶ i–ix, II ¶ 8). On the three exams administered between 2009 and September 2016, African American applicants passed the exams at a lower rate than white applicants, and these disparities were statistically significant. (*Id.* § I.B. ¶¶ i–ix). A fourth exam, administered from September 2016 through April 27, 2019, was nearly identical to the one used from 2015 to September 2016. (*Id.*). The United States contends that approximately twenty-three additional African American applicants would have been hired into entry-level police officer and/or cadet positions with the BCPD since January 1, 2013, absent the County's use of the challenged exams. (*Id.* ¶ x). Though

---

[1] The amended version of the Agreement incorporates strictly technical revisions to address some administrative aspects of the claims process applicable following the approval of the Agreement. Those revisions do not affect the interests of third parties to the Agreement.

[2] Applicants also must pass additional screening measures, including a physical agility test, a medical exam, a psychological evaluation, and a background investigation. Those measures are not at issue in this case.

it does not admit liability, the County stipulates that the United States contends that the use of the exams was not job related and consistent with business necessity. (*Id.*¶¶ xi–xii).

The Agreement will replace the challenged exams with a new selection device that promotes the County's public safety need to hire qualified police officer and cadet candidates and also complies with Title VII; and will provide individual relief to eligible claimants who, the United States alleges, were not considered for employment due to the challenged exams. To further those purposes, the Agreement provides for injunctive and individual relief. (*Id.* § III).

## I.     Injunctive Relief

The County will be enjoined from using the challenged exams and from using any written exam as part of the selection process for entry-level police officers or cadets in any manner that results in a disparate impact upon African American applicants and is not shown to be job related and consistent with business necessity. (*Id.* § V.A ¶¶ 28–29).[3] The County will administer a written exam as a selection device only with the consent of the United States or, if the parties cannot reach agreement, with the approval of the court. (*Id.* § V.A. ¶ 30).

In place of the challenged exams, the County will adopt and use a new selection device that has no statistically significant adverse impact on the basis of race, or, if it has such impact shall have been demonstrated to be job related for the police officer and cadet position and consistent with business necessity. (*Id.* § V.D. ¶ 40). The new selection device will be developed

---

[3] Because the development of a new selection device to replace the challenged written exams will take some time, the parties have agreed that the County will be permitted to use the National Police Officer Selection Test as a selection device on an interim basis. (*Id.* § V.C. ¶¶ 33–34). The Agreement includes provisions that enable the United States to determine, after the new selection device is in place, whether the use of the interim exam complied with Title VII. If the exam is found not to comply with Title VII, that will trigger additional individual relief, including the priority hiring of up to six people from the pool of African American applicants who fail the interim exam but pass the new selection device. (*Id.* ¶¶ 35–39).

by a third-party test developer selected in accordance with the Agreement. (*Id.* ¶ 41). The Agreement includes standards for validating the new selection device and a timeline for its development, validation, approval by the United States or the court, and implementation. (*Id.* ¶¶ 41–47).

## II.   Individual Relief

The Agreement provides for two forms of individual relief:  back pay and priority hiring. (*Id.* § VI.A. ¶ 48). Individual claimants will be eligible for relief if: (i) they are African American; (ii) between January 2010 and April 27, 2019, they took and failed any of the challenged exams; and (iii) they meet the minimum qualifications for employment that existed at the time they were disqualified, and, only in the case of priority hiring relief, if they meet the minimum qualifications in effect and required of all police officer and cadet applicants at the time they are completing the screening and selection procedures. (*Id.* §VI.E. ¶ 59–61).[4][5]

The United States will provide the County with a proposed individual relief awards list that identifies the claimants, the type of relief they sought, the relief for which the United States finds them eligible, and, if the United States finds them eligible for back pay, the amount of back pay to be awarded. (*id.* § VI.H. ¶ 65). The list will be provided to the County no later than 120 days after the date of entry of the Agreement. (*Id.* § VI.H. ¶ 65).

Claimants will be permitted to object to the United States' determination regarding their individual relief in accordance with the Agreement following its entry. (*Id.* VII.D. ¶ 71). The

---

[4] Current BCPD polices officers are eligible for back pay relief, but are not eligible for priority hiring relief. (*Id.* ¶ 60).

[5] The Agreement also establishes a procedure which applicants who wish to be considered for individual relief under the Agreement must follow in order to be considered for such relief. (Id. §§ VI.C–D).

County also may object in writing to any of the United States' determinations regarding eligibility for priority hiring relief. (*Id.* § VI.H. ¶ 66). The court will hold a fairness hearing on individual relief awards and shall approve the United States' amended list of individual relief awards as final if it determines the awards to be fair, adequate and reasonable. (*Id.* § VII.G.).

### a.  Back Pay Relief

The County agrees to establish a two-million-dollar ($2,000,000) settlement fund from which back pay relief will be distributed to eligible claimants. (*Id.* § VI.B.). Claimants eligible for back pay relief will receive an award from the settlement fund as determined by the United States, and approved by the court, taking into account when each claimant was first disqualified by any of the challenged exams and the position for which they were eligible to be hired at the time they were first disqualified. The County's limit of liability for back pay shall be no greater than $2,000,000.[6] (*Id.* §§ VI.F. ¶ 63, VII.G. ¶78, VIII.A–C.).

### b.  Priority Hiring Relief

From the claimants eligible for priority hiring relief under the amended final individual relief awards list, the County shall make up to twenty priority hires. (*Id.* § VII.D. ¶ 100). Priority hires will receive (i) an award of retroactive seniority; (ii) a hiring bonus in lieu of retroactive pension benefits; and (iii) vacation days granted upon graduation from the BCPD academy. (*Id.* ¶¶ 100, 110–12). Eligible claimants must appear for and successfully complete the County's police officer and cadet screening and selection procedures that are then in effect and required of all other

---

[6] But the County also will be responsible for the county's portion of payroll taxes and Medicare and Social Security contributions applicable to any back pay relief award. These amounts will not be deducted from any back pay relief and will not be payable from the settlement fund. (*Id.* § VIII.C. ¶ 91).

police officers and cadets. (*Id.* ¶ 104). A written offer of a priority hire is conditional on successful completion of the screening and selection procedures. (*Id.* ¶ 107).

Claimants will receive retroactive seniority for the purposes of calculating an individual's regular rate of pay, annual leave, vacation accrual after the first year of employment, layoffs/reductions in work force, recall from layoffs/reduction in work force, assignments to specialized units, and transfers between precincts. (*Id.* ¶ 110). Retroactive seniority will not be granted for the purposes of scheduling leave, personal time, vacation time, or days off from work of any type, nor will it be used to satisfy any applicable probationary periods or any time-in-grade minimums required to be eligible for promotions, assignments, or transfers. (*Id.*).

### III.     Required Notice and Processes to Protect the Agreement from Collateral Attack

To protect against later challenges to the Agreement, *see* 42 U.S.C. § 2000e-2(n)(1), and enable the court to hear any third-party objections to the Agreement, the Agreement provides for two fairness hearings—one on the Agreement itself prior to its final approval, and one on the individual relief, discussed above, to be held prior to the implementation of that relief. (ECF 42-3, Agreement §§ IV, VII). Prior to the fairness hearing on the Agreement held April 6, 2021, persons whose interests might be affected by the Agreement were provided with notice of the Agreement and of the hearing and were provided an opportunity to object to the Agreement. (*Id.* §§ IV.C–E). This court has reviewed the written objections to the Agreement received by the parties, and eight individuals who objected to the Agreement spoke on the record during the April 6, 2021, fairness hearing.

The parties agree, and the court is satisfied, that the notice provisions of the Agreement and procedures set forth therein are sufficient to meet the requirements of Section 703(n)(1) of

Title VII, 42 U.S.C. § 2000e-2(n)(1) and to protect the Agreement from collateral attack, while

addressing due process concerns.[7]

## STANDARD OF REVIEW

In considering whether to enter a proposed settlement agreement in a Title VII pattern or

practice suit, the court is guided by the general principle that settlements are encouraged under

Title VII. *See United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999); *Carson v. Am.*

*Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981). The court "must satisfy itself that the agreement is fair,

adequate, and reasonable, and is not illegal, a product of collusion, or against the public interest."

*L.J. Wilbon*, 633 F. 3d 297, 311 (4th Cir. 2011) (quoting *North Carolina*, 180 F.3d at 581).

---

[7] Section 703(n)(1) of Title VII provides:

>    (A) Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B).

>    (B) A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws--

>> (i) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had--

>>> (I) actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and

>>> (II) a reasonable opportunity to present objections to such judgment or order; or

>> (ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.

42 U.S.C.A. § 2000e-2(n)(1).

The fairness of the proposed agreement is judged "by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson*, 450 U.S. at 88 n.14. This assessment is not to be on the scale of "a trial or a rehearsal of the trial[;]" but the court must ensure that it reaches "an informed, just and reasoned decision." *North Carolina*, 180 F.3d at 581 (internal quotation marks omitted). The court must also consider "the extent of discovery that has taken place, the stage of the proceedings, the want of collusion in the settlement and the experience of plaintiffs' counsel who negotiated the settlement." *Id.*

## DISCUSSION

### I.  Fairness, Adequacy, and Reasonableness

#### a.  The United States Is Likely to Succeed on the Merits Under Title VII

The United States' complaint alleges that the County used policies and practices that discriminate against African Americans because of their race, in violation of Section 703(a) of Title VII, 42 U.S.C. § 2000e-2(a)'s mandate that employers may not engage in practices that "adversely affect" or have a disparate impact on an individual's status as an employee because of their race. (ECF 1, Compl. ¶ 25).

Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). For example, testing mechanisms used to screen potential employees are unlawful under Title VII if they disproportionately screen out African American candidates compared with their white counterparts and the test is shown to be unrelated to measuring the candidates' job capabilities. *Id.* at 432; *see also* 42 U.S.C. § 2000e-2(k). The United States alleges that the County's use of the challenged exams in the selection of entry level police officers and cadets has had an unlawful

disparate impact on African American applicants and is not job related and consistent with business necessity as required by 42 U.S.C. § 2000e-2(k).

Were this case to proceed to trial, the United States would first be required to establish a *prima facie* case of discrimination, by showing that the challenged exams disproportionately impact (that is, they disproportionately exclude) African American applicants. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i). Plaintiffs commonly establish evidence of such a disparate impact using statistical evidence that shows members of a protected class are less likely to pass the test in question, to a degree that the disparity raises "an inference of causation." *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 (1988); *see also Walls v. City of Petersburg*, 895 F.2d 188, 191 (4th Cir. 1990).

In this case, the United States analyzed the pass rates for African American applicants compared to white applicants on each of the challenged exams. For the purposes of the Settlement Agreement, the parties have stipulated that the results of those analyses showed that for each challenged exam, African American applicants passed at a lower rate than white applicants, and that, using a standard deviation analysis, the disparities were shown to be statistically significant.[8] (ECF 42-3, Amended Settlement Agreement § I.B ¶¶ iii, v, vii, ix). A standard deviation analysis is a method of determining whether the "underrepresentation of a protected minority group in any sample made up of a protected and a nonprotected group . . . might be attributable to normal fluctuations of chance rather than to discriminatory" effect. *EEOC v. Am. Nat'l Bank*, 652 F.2d

---

[8] During the fairness hearing, at least one objector expressed the belief that they were excluded from consideration for a police officer or cadet position simply because they identified themselves as African American on the challenged exams or in some part of the BCPD hiring process. The United States has made no allegation that the County excluded African Americans from consideration on such an explicit basis. Rather, the claim is that fewer African Americans received a passing score on the facially neutral challenged exams and that the exams were not shown to be related to the police officer or cadet position.

1176, 1191 (4th Cir. 1981). "The difference between actual ('observed') numbers of the protected group in such a sample and the number that would be 'expected' in a perfectly proportional process of selection from the appropriate pool can then be expressed in numbers of standard deviations." *Id.* The greater the standard deviation gleaned from this analysis, the smaller the probability that the disparity is a result of chance. *Id.* The Court of Appeals for the Fourth Circuit has recognized that the probability that a disparity is due to chance is just five percent at two standard deviations; accordingly, analyses that show a standard deviation in the range of two or three may be sufficient to establish a *prima facie* case of disparate impact. *Id.* at 1192–93. Here, the United States' standard deviation analysis showed that the disparity equates to over seven units of standard deviation for each exam, meaning that it is highly unlikely that the disparities in the pass rates for the exams are due to chance. The United States' evidence thus supports a *prima facie* case of disparate impact if this case were to proceed to trial.

Once the *prima facie* case is established, to defend its exams the County would be required to prove, by the use of a professionally acceptable methodology, *see Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975), that its use of the challenged exams was "job related" for the entry level police officer and cadet positions "and consistent with business necessity," 42 U.S.C. § 2000e-2(k)(1)(A)(i). For the purposes of the Agreement, the County has stipulated that the challenged exams were not properly validated by an acceptable methodology and were not job related and consistent with business necessity for the positions in question. Therefore, it appears that were this case to proceed to trial the County would be unlikely to rebut the United States' *prima facie* case of disparate impact, and the United States would be likely to succeed on the merits.

**b. Adequacy of Relief**

The court also must consider whether the amount and form of relief contemplated by the Agreement is adequate. *See North Carolina*, 180 F.3d at 581. It is clear that the agreed upon injunctive and individual relief, including priority hiring, back pay, and retroactive seniority, outlined above, comports with the purposes of Title VII in that it is intended to cure the discriminatory effect of the challenged exams and prevent future discrimination in the County's hiring for entry-level police officer and cadet positions. In a pattern and practice case, a finding of a violation alone merits an award of injunctive relief. *Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 361 (1977). Furthermore, one of the "central purposes of Title VII is 'to make persons whole for injuries on account of unlawful employment discrimination.'" *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (quoting *Albemarle*, 422 U.S. at 418). Injured parties are to be placed, "as near as may be, in the situation [they] would have occupied if the wrong had not been committed." *Albemarle*, 422 U.S. at 418–19. In pattern and practice cases that identify an unlawful hiring practice, "three basic components" of "make whole" relief are "a job offer, backpay, and retroactive seniority." *See Wrenn v. Dep't of Veterans Affs.*, 918 F.2d 1073, 1076 (2d Cir. 1990) (citing *Franks*, 424 U.S. at 781; *Albemarle*, 422 U.S. at 421).

The limited number of objections that were received do not persuade the court that the relief is inadequate or otherwise inappropriate under Title VII. Notice of the Agreement was sent to over 1600 potential claimants, to additional interested persons, including each police officer and cadet currently employed with the County and unions authorized to represent police officers and cadets in the BCPD, and to the public at large. (ECF 42-3, Agreement § IV.D.). Considering the large number of persons so apprised of the settlement, opposition to the Agreement is minimal. The parties received 216 objections to the Agreement, the majority of which did not provide a

11

substantive basis for objecting to the relief discussed herein.[9] Those objections that can properly

be considered substantive fall into five categories, which the court will address in turn.

First, three objections claimed that all applicants to the positions in question, not just

African Americans, should receive relief. (*See, e.g.*, ECF 42-4 at 76). The court will overrule these

objections. The claims in this lawsuit address only the disparate impact of the County's use of the

challenged exams and found a disparate impact only on African American applicants. There is no

claim that the challenged practices had an unlawful disparate impact on any other protected class;

thus, it would not be appropriate to award relief to persons who are not alleged to have been harmed

by the County's conduct.

Second, twenty-six objectors claimed that the challenged exams were not discriminatory

because the challenged exams were not intentionally biased and tested all applicants on the same

material. The objections of Objector Numbers 1 and 155[10] are representative of this category of

objections. These objectors maintained that a test could not be discriminatory if all applicants were

given the same exam and that the exams were job-related because they tested such skills as

---

[9] Of the 216 objections, fifty-one objections were duplicates of previously submitted objections (*see* ECF 42-17); seventy-four objections were blank or provided insufficient information as to the nature of the objection (*see* ECF 42-18); forty-seven objections were attempts to apply for relief or informing the United States that the objector failed one of the challenged exams or was otherwise disqualified from BCPD hiring or subjected to discrimination by the County (*see* ECF 42-20); and three objections supported or were neutral as to the Agreement (*see* ECF 42-19).

[10] Pursuant to the Agreement, the parties agreed that they will keep confidential the names and personally identifiable information of any individual who seeks or receives relief under the Agreement. (ECF 42-3, Agreement § VIII.E ¶ 116). Because it appeared that some individual objectors may be eligible to apply for relief, the parties assigned all objectors a number for the purposes of the fairness hearing in order to maintain the anonymity of individuals who may later seek relief under the Agreement. Regardless whether an individual objector intended to seek relief under the Agreement, the court permitted all objectors to remain anonymous during the fairness hearing and will refer to objectors by number in this Memorandum.

observation, reading, writing, spelling, grammar, and vocabulary. (ECF 42-4 at 4; ECF 42-5 at 234).[11]

The court will overrule these objections. The United States' claim does not require it to show that the County intentionally discriminated against African American applicants for the entry level police officer and cadet positions. An employment practice, including a written exam, that applies the same criteria to all employees or applicants may nonetheless operate to exclude a protected class on a disparate basis. *See Griggs*, 401 U.S. at 431. When a practice does so, and it is not job-related and consistent with business necessity, it creates an arbitrary and discriminatory barrier based on protected class status and violates Title VII. *See Ricci v. DeStefano*, 557 U.S. 557, 577–78 (2009) (citing *Griggs*, 401 U.S. at 431, 432). The court acknowledges the objectors' anecdotal observations that the challenged exams test skills they believe to be of value to police officers and cadets in the BCPD. But "nonempirical or anecdotal" assertions that an exam relates to the job in question are insufficient to justify a disparate impact. *See* 28 C.F.R. § 50.14. And for the purposes of the Agreement, the County has stipulated to the contrary—African American candidates were disproportionately screened out of the hiring process through the use of the challenged exams, which were not shown to be properly validated as job related or consistent with business necessity. (ECF 42-3, Agreement § I.B. ¶¶ i–xi).

Third, five objections claimed that the priority hiring relief will result in the hiring of unqualified officers and cadets, and is therefore a public safety risk. (*See, e.g.*, ECF 42-4 at 105;

---

[11] Objector 155 further suggested that the disparity is a result of fewer African Americans taking the challenged exams. (ECF 42-5 at 234). The record contains no information on the raw number of individuals who took the challenged exams; further, it is not the case that a small sample size invariably will produce a disparity in pass rates for one group compared with another. Here, the United States has shown that the difference in pass rates between African American and white applicants is statistically significant and not due to chance.

ECF 42-5 at 649, 734). The court will overrule these objections. The Agreement does not require the BCPD to hire any applicant who is not qualified for a police officer or cadet position. Priority hire applicants will be subject to the same selection process as all other BCPD applicants, including the new selection device. Hiring relief in this case will operate to eliminate the effects of discrimination on the BCPD's workforce. To deny such relief would "frustrate [Title VII's] central statutory purposes of eradicating discrimination . . . and making persons whole for injuries suffered through past discrimination." *Albemarle*, 422 U.S. at 421.

Fourth, twelve objections claimed that giving retroactive seniority to priority hires is unfair for a number of reasons, including that it will affect the seniority rights of incumbent officers, result in the promotion of unqualified officers, or it has not been fairly earned. (*See, e.g.*, ECF 42-4 at 64; ECF 42-5 at 599). These objections will be overruled. The priority hires the County has agreed to make are victims of the County's alleged discriminatory use of the challenged exams and accordingly are presumptively entitled to retroactive seniority. *Franks*, 424 U.S. at 765–66; *see also Prudencio v. Runyon*, 3 F. Supp. 2d 703, 705 (W.D. Va. 1998). Such relief is essential to make whole relief because it grants to the priority hires the seniority they would have earned had the challenged exams not screened them out of the hiring process. *Franks*, 424 U.S. at 767. Without such an award, an individual who applies for and obtains a priority hire position pursuant to the Agreement "will perpetually remain subordinate to persons who, but for the illegal discrimination, would have been in respect to entitlement to these benefits [their] inferiors." *Id.* at 768. This relief is not to be "denied on the abstract basis of adverse impact upon interests of other employees." *Id.* at 779 n.41. And at any rate the relief provided in the Agreement has been tailored such that incumbent employees will be minimally affected. The retroactive benefits are to be provided only to up to twenty priority hires, a small fraction of the BCPD's overall force, and the benefits do not

extend to many of the seniority rights which are "competitive." For instance, retroactive seniority will not be granted for the purposes of scheduling leave or vacation time. (ECF 42-3, Agreement § VII.D. ¶ 110). To the extent some objectors fear that retroactive benefits will result in the promotion of unqualified officers or result in workplace tensions, such objections are unfounded. Priority hires cannot use any retroactive seniority to fulfill any eligibility requirements for a promotion. (ECF 42-3, Agreement § VII.D. ¶ 110). And the potential that incumbent officers will be unhappy about the retroactive seniority awarded is not a basis for denying relief. *See Franks*, 424 U.S. at 775 (citing *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2d Cir. 1971)). Moreover, because the Agreement provides for the continued anonymity of the claimants who are awarded relief, there is no basis on which an incumbent officer would know that a new colleague received retroactive seniority.

Fifth, eleven objections made claims about the fairness of back pay. These objections included claims that back pay was not fairly earned (*see, e.g.*, ECF 42-4 at 187) and that the money could be better used for other purposes (*see, e.g.*, ECF 42-5 at 23). Like retroactive seniority, back pay is a core component of make whole relief, and is presumptively available to those injured by an unlawful employment practice. *See Wrenn*, 918 F.2d at 1076. Denial of back pay relief is only appropriate where relief would frustrate, rather than further the objectives of Title VII. *Albemarle*, 422 U.S. at 421; *see also Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 651 (4th Cir. 2002). Concerns that benefits were unearned or could be better spent on matters unrelated to remedying the alleged unlawful employment practice at issue here do not demonstrate that the back-pay award would be inconsistent with Title VII—thus, these objections will be overruled.

Other objections to the back-pay relief focused on the amount awarded, with some claiming the settlement fund is excessive and creates a windfall for claimants and others claiming that the

$2,000,000 is inadequate to fully compensate the claimants. (*See, e.g.*, ECF 42-4 at 32; ECF 42-5 at 245). The court agrees with the parties that the amount of the settlement is appropriately tailored to redress the injury at issue. Starting from the United States' estimate that the County would have hired an additional twenty-three African American police officers and cadets absent the County's use of the challenged exams, the parties estimated the total salary that would have been paid to those officers had they been appropriately hired, using estimated hire dates for the positions that corresponded to the dates on which the County actually hired applicants from each of the exams. Where, as here, it is not possible years after the County's use of the challenged exams to determine which claimants would have received one of the twenty-three positions, courts have recognized that it is appropriate to calculate a gross award for all class members and divide the award among them on a pro rata basis.[12] *See, e.g.*, *United States v. City of Miami*, 195 F.3d 1292, 1300 (11th Cir. 1999); *United States v. U.S. Steel Corp.*, 520 F.2d 1043, 1055–56 (5th Cir. 1975*)*; *White v. Carolina Paperboard Corp.*, 564 F.2d 1073, 1087 (4th Cir. 1977).

In sum, the court is satisfied that the Agreement provides adequate relief in the form of a detailed process that will replace the challenged exams, comply with Title VII without compromising public safety, and provide appropriate make-whole relief to individuals adversely affected by the use of the challenged exams.

---

[12] As at least one objector noted at the hearing, awarding back pay relief on a pro rata basis means that until the number of claimants is ascertained, potential claimants do not know the amount they may receive under the Agreement. The court acknowledges the difficulty of this uncertainty for potential claimants, but notes that the Agreement ensures that once the number of eligible claimants has been identified, those individuals will promptly be notified of the amount of their award and they will have an opportunity to object to such calculation. *Cf. Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir. 1975) ("exactitude is not required" in making back pay determinations).

### c. Extent of Completed Discovery, Stage of Proceedings, Absence of Collusion, and Experience of Counsel

Finally, the extent of completed discovery, the stage of proceedings, absence of collusion, and experience of counsel all weigh in favor of a finding that the Agreement is fair, adequate and reasonable. *See North Carolina*, 180 F.3d at 581. First, though no formal discovery occurred in this litigation, the parties reached the Agreement after a multi-year investigation by the United States and over a year of settlement negotiations, which included the exchange of sufficient information to evaluate the strength of the United States' claims and the appropriate relief. Second, counsel for the United States are highly experienced in Title VII enforcement cases. "[I]n a complex case settled by consent decree, 'where a government agency charged with protecting the public interest has pulled the laboring oar in constructing the proposed settlement,'" the court "accord[s] substantial weight to the agency's expertise and public interest responsibility." *Am. Canoe Ass'n, Inc. v. EPA*, 54 F. Supp. 2d 621, 625 (E.D. Va. 1999) (quoting *Bragg v. Robertson*, 54 F. Supp. 2d 653, 660 (S.D.W.Va.1999)). Third, the parties reached the Agreement after lengthy settlement negotiations, including several mediation sessions with Magistrate Judge Gauvey; it cannot be said that the Agreement is a product of collusion. *See United States v. Westvaco Corp.*, No. CV MJG-00-2602, 2016 WL 4492704, at *5 (D. Md. Aug. 26, 2016).[13]

### CONCLUSION

For the foregoing reasons, the court will conclude that that terms of the Agreement are fair, adequate, reasonable, lawful and not a product of collusion or against the public interest; will

---

[13] Unpublished opinions are cited for the soundness of their reasoning and not for any precedential value.

17

overrule all objections to the Agreement; and will grant the parties' joint motion to enter the Agreement as final. A separate Order follows.


  5/19/2021                                                    /S/
Date                                            Catherine C. Blake
                                                U.S. District Court Judge